Barry I. Levy, Esq.
Steven Henesy, Esq.
Michael Vanunu, Esq.
Rawson Jahan, Esq.
Danielle M. Drasser, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY,

Docket No.:

Plaintiffs,

**Plaintiffs Demand a Trial by Jury**

-against-

MKIND MED PRODUCTS CORP., MICHAEL KOZAK, KA MEDICAL SUPPLIES INC., KAMILA ABDUKADYROVA, and JOHN DOE DEFENDANTS "1" through "10",

Defendants.

------------------------------------------------------------------X

# COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against Mkind Med Products Corp., Michael Kozak, KA Medical Supplies Inc., Kamila Abdukadyrova (collectively, the "Defendants"), and John Doe Defendants "1" through "10" (the "John Doe Defendants"), hereby allege as follows:

## INTRODUCTION

1. GEICO brings this action to recover more than $680,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") comprised of medically unnecessary pneumatic compression devices ("PCDs"), ultrasound bone growth stimulation devices ("Osteogenesis Stimulators"), and "Powered Pressure-Reducing Air Mattresses" ("Powered Air Mattresses") (collectively, the "Fraudulent Equipment") through two DME companies, Mkind Med Products Corp. ("Mkind Med Products") and KA Medical Supplies Inc. ("KA Medical Supplies") (collectively, the "DME Providers").

2. The DME Providers are both New York corporations that have sequentially dispensed Fraudulent Equipment to persons who were allegedly involved and injured in automobile accidents and were entitled to coverage under no-fault insurance policies issued by GEICO ("Insureds") as part of a "quick hit" scheme to submit a large volume of billing to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

3. While Mkind Med Products is purportedly owned by Michael Kozak ("Kozak"), and KA Medical Supplies is purportedly owned by Kamila Abdukadyrova ("Abdukadyrova") (collectively, the "Paper Owner Defendants"), at all times the DME Providers were actually controlled by others not presently identifiable to GEICO.

4. The Defendants, in conjunction with others not presently identifiable to GEICO, devised a fraudulent scheme that involved (i) associating and colluding with the layperson operators and managers (the "Clinic Controllers") of various no-fault medical clinics (the "Clinics"), (ii) obtaining prescriptions through the payment of kickbacks and other financial incentives for medically unnecessary Fraudulent Equipment purportedly issued by healthcare

providers (the "Referring Providers") who were working out of Clinics in the New York metropolitan area, and (iii) using these prescriptions for medically unnecessary Fraudulent Equipment to submit billing to GEICO and the New York automobile industry with each DME Provider making common fraudulent misrepresentations regarding the type and nature of the Fraudulent Equipment in order to inflate the charges to GEICO and maximize Defendants' ill-gotten gains. Through this fraudulent scheme, Defendants collectively billed GEICO for more than $2.5 million, with each DME Provider making virtually identical fraudulent misrepresentations to GEICO concerning the types of Fraudulent Equipment allegedly provided to Insureds. As part of their scheme to extract money and avoid detection, Defendants shifted the billing from Mkind Med Products to KA Medical Supplies from February 2025 to July 2025 and the scheme has continued uninterrupted through the present day, as Defendants continue to seek collections on the fraudulent billing through today.

5. GEICO seeks to terminate this fraudulent scheme and recover more than $680,000.00 that has been wrongfully obtained by the Defendants since 2025 and, further, a declaration that it is not legally obligated to pay reimbursement of more than $1,355,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the DME Providers since 2025 because:

(i) The Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions issued and secured through collusive arrangements and were otherwise illegitimate because they contained photocopied or duplicated signatures of the Referring Provider;

(ii) The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers

who are licensed to issue such prescriptions;

(iii) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(iv) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

6. The Defendants fall into the following categories:

(i) The DME Providers are New York corporations that are used as the billing arm of the fraudulent scheme – they purport to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bill New York automobile insurance companies, including GEICO;

(ii) Defendant Kozak is one of the primary drivers of the fraudulent scheme. Kozak is listed on paper as the owner, operator, and controller of Mkind Med Products, when, as discussed below, Kozak works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from all the DME Providers, and used Mkind Med Products to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii) Defendant Abdukadyrova is also one of the primary drivers of the fraudulent scheme. Abdukadyrova is listed on paper as the owner, operator, and controller of KA Medical Supplies, when, as discussed below, Abdukadyrova works for one of the John Doe Defendants who secretly operated, managed, controlled, and financially benefited from all the DME Providers. KA Medical Supplies was used to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv) The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are presently not identifiable they include the person(s) secretly controlling and profiting from the DME Providers and the Clinic Controllers who are associated with the Clinics and have colluded with Defendants to further drive and financially benefit from the common fraudulent scheme committed against GEICO and other New York

automobile insurers through their associations with the Referring Providers and control of the Clinics.

7. As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements; (ii) the Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iii) the bills fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds; and (iv) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's no-fault laws.

8. As such, Defendants do not now have — and never had — any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

9. The charts attached hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims, which were submitted or caused to be submitted to GEICO pursuant to Defendants' fraudulent scheme through Mkind Med Products and KA Medical Supplies.

10. The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than February 2025 and has continued uninterrupted through the present day, as Defendants continue to attempt to seek collection on pending charges for the Fraudulent Equipment.

11. As a result of Defendants' fraudulent scheme, GEICO has incurred damages of

more than $680,000.00, which represents payments made by GEICO based on the representations contained in the billing submitted by the Defendants.

## THE PARTIES

### I. Plaintiffs

12. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are each Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II. Defendants

13. John Doe Defendant "1" (hereinafter, the "Secret Owner") is presently not identifiable but is secretly controlling and profiting from the DME Providers, and conspired with others who are not presently identifiable at various Clinics to obtain prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers, which were used by the DME Providers to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

14. Defendant Kozak is a citizen of New York and resides in Kings County. Kozak is listed as the paper owner of Mkind Med Products. Kozak is not and has never been a licensed healthcare provider. Kozak at all relevant times, has been one of the primary drivers of the fraudulent scheme. Kozak participated in the scheme with the Secret Owner, purporting to own, operate, and control Mkind Med Products, and associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers. Kozak used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

15. Defendant Mkind Med Products is a New York corporation with its principal place of business in Kings County. Mkind Med Products was incorporated on January 29, 2025, and is owned on paper and purportedly operated and controlled by Kozak. In actuality, the Secret Owner operated, managed, controlled, and financially benefited from Mkind Med Products and, with the aid of Kozak, used Mkind Med Products as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16. Defendant Abdukadyrova is a citizen of New York and resides in Kings County. Abdukadyrova is listed as the paper owner of KA Medical Supplies. Abdukadyrova is not and has never been a licensed healthcare provider. Abdukadyrova, at all relevant times, has been one of the primary drivers of the fraudulent scheme. Abdukadyrova participated in the scheme with the Secret Owner, purporting to own, operate, and control KA Medical Supplies, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers. Abdukadyrova used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

17. Defendant KA Medical Supplies is a New York corporation with its principal place of business in Kings County. KA Medical Supplies was incorporated on April 24, 2025, and is owned on paper and purportedly operated and controlled by Abdukadyrova. In actuality, the Secret Owner operated, managed, controlled and financially benefited from KA Medical Supplies and used KA Medical Supplies as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18. The John Doe Defendants are individuals who are not presently identifiable and include the Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who unlawfully own and control the Clinics and the relationships with the

Referring Providers, and who have conspired with the Defendants and Secret Owner to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit.

## JURISDICTION AND VENUE

19. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants resides.

## ALLEGATIONS COMMON TO ALL CLAIMS

22. GEICO underwrites automobile insurance in the State of New York.

### I. An Overview of the Pertinent Laws

#### A. Pertinent Laws Governing No-Fault Insurance Reimbursement

23. New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

24. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65,

et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

25. In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

26. In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

27. Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

28. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

29. Pursuant to duly executed agreement, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

30. In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or

"CMS-1500 form").

31. Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

32. Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B. Pertinent Regulations Governing No-Fault Benefits, DME**

33. Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

34. Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement." See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist,

chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist." See N.Y. P.H.L. § 238(11).

35. A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment," which is a DME supplier such as the Provider Defendants. See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overtly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

36. DME generally consists of items that can withstand repeated use and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads, cervical traction units, and the Fraudulent Equipment purportedly dispensed by the DME Providers.

37. To ensure that Insureds' $50,000.00 in minimum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

38. In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> (i) [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

39. As it relates to DME and orthotic devices, the New York State Workers'

Compensation Board adopted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("Fee Schedule") that became effective on April 4, 2022.

40. Among other things, the Fee Schedule limited the reimbursement rates of certain previously abused DME charges and established a maximum permissible charge for certain specifically listed pieces of DME ("Fee Schedule item"). The charges for the reimbursement of DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

41. Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the Fee Schedule ("Non-Fee Schedule item").

42. For Non-Fee Schedule items that are provided by a DME supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; <u>or</u> (2) the usual and customary price charged to the general public. <u>See</u> 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

43. For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

44. For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arm's-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

45. Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i) The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(ii) The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iii) The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

(iv) The fee sought for DME provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II. <u>Defendants' Fraudulent Scheme</u>

### A. The DME Providers' Common Secret Ownership

46. The Secret Owner, Paper Owner Defendants, and John Doe Defendants conspired to design and implement a complex fraudulent scheme in which the DME Providers were used consecutively with each other to bill GEICO alone for over $2.5 million in No-Fault Benefits to which they were never entitled to receive.

47. While both DME Providers were formed and listed as being independently owned by the Paper Owner Defendants, the DME Providers were each actually controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile insurers.

48. The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents that needed to be filed with the State of New York to lawfully operate the DME Providers.

49. In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the DME Providers that could only exist through the Secret Owner's involvement.

50. For example, the Secret Owner, together with the Paper Owner Defendants, operated the DME Providers in a sequential fashion, allowing for slight overlap to transition the billing from Mkind Med Products to KA Medical Supplies, with the intent of limiting the amount of billing submitted from any one of the DME providers and masking the common fraudulent scheme.

(i) Mkind Med Products billed GEICO for dates of service between February 11, 2025, and May 19, 2025.

(ii) KA Medical Supplies billed GEICO for dates of service between May 12, 2025, and July 27, 2025.

51. Additionally, the DME Providers both predominantly received prescriptions for the same three pieces of Fraudulent Equipment and thereafter both billed GEICO for the same three types of Fraudulent Equipment: PCDs, Osteogenesis Stimulators, and Powered Air Mattresses.

52. Further, and as discussed further below, the DME Providers each billed GEICO using virtually identical HCPCS Codes in response to the virtually identical prescriptions for Fraudulent Equipment they received, and the DME Providers each made virtually identical coding misrepresentations and reimbursement misrepresentations in their billing to GEICO.

53. In keeping with the fact that the DME Providers are actually controlled by the Secret Owner and were operated as part of a common scheme, the DME Providers both used delivery receipts with virtually identical authorization provisions in their supporting documentation to GEICO. For example:

MKIND MEDICAL PRODUCTS
621 Brighton Beach Ave
Brooklyn, NY 11235

DELIVERY RECEIPT

Patient's Name: [redacted]
Accident Date: 01/07/2025
Date Of Birth: [redacted]

Equipment Dispensed To Patient:

☐ Powered Pressure-Reducing Air Mattress ☐ Wearable P.E.M.F Device
☑ Ultrasound Therapy ☐ Pneumatic Compression Device

I,(Print patient's name) [redacted] ("Assignor") hereby assign to ("Assignee") listed above all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law.
I confirm that I have received the above-mentioned device, along with instructions on its proper use and care. I understand its intended purpose, handling, and maintenance requirements. I agree to follow the provided guidelines to ensure its safe and effective use. Furthermore, I accept responsibility for any misuse or negligence that may result in damage or improper function. If I have any questions or concerns, I will seek clarification from the provider.

Signature of Patient: [redacted]
Date: 03/28/25

KA MEDICAL SUPPLIES INC
69 BEVY CT
BROOKLYN, NY 11229

PATIENT-
DELIVERY RECEIPT

Patient's Name: [redacted]
Accident Date: 04/01/2025
Date Of Birth [redacted]

Equipment Dispensed To Patient:
1. Pneumatic Compression Device

I,(Print patient's name) [redacted] ("Assignor") hereby assign to ("Assignee") listed above all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law.

I confirm that I have received the above-mentioned device, along with instructions on its proper use and care. I understand its intended purpose, handling, and maintenance requirements. I agree to follow the provided guidelines to ensure its safe and effective use. Furthermore, I accept responsibility for any misuse or negligence that may result in damage or improper function. If I have any questions or concerns, I will seek clarification from the provider.

Signature of Patient: [redacted] Date: 5/30/2025

54. In addition to the virtually identical delivery slips, when the DME Provider Defendants dispensed PCDs, Osteogenesis Stimulators, and Powered Air Mattresses, the DME Provider Defendants did so pursuant to virtually identical preprinted prescription forms (the "Fraudulent Prescription Forms"), which the DME Provider Defendants then submitted in support of their billing to GEICO. For example:

| Mkind Med Products | KA Medical Supplies |
|---|---|

**Mkind Med Products**



Patient Information

Patient Name: [redacted]

DOB: [redacted] DOA: 1/16/25

☐ E0747: Wearable PEMF Devise

☐ E0221: Infrared Heating Pad System

☐ E0277: Powered Pressure-Reducing Air Mattress

☑ E0675: Pneumatic Compression Device

☑ E0760: Osteogenisis Stimulator - Ultrasound

Osteogenesis stimulators assist in healing fractures when healing has stalled. This procedure is one of complex processes which depend on factors such as the rate at which bone repairs, the level of tissue damage and degree of separation between bone ends, and the blood flow to the area.

Pneumatic Compression Device is used to deliver high pressure and rapid inflation/deflation cycles for treatment of arterial insufficiency.

Powered Pressure-Reducing Air Mattress reduces pressure on wounds, allowing healing and blood circulation to the affected area.

Infrared Heat Unit promotes healing through increase of blood circulation, muscle relaxation, and tissue repair.

Provider Information

Provider Signature: [signature] Date: ______

Provider Name (Printed): Sophia Staley NP NPI: 1205507597

Provider Address: ______

City: ______ MEDICAL PLAZA State: ______ Zip Code: ______

1251 Ralph Avenue
Brooklyn, NY 11236

Phone Number: ______

**KA Medical Supplies**



Patient Information

Patient Name: [redacted]

DOB: ______ DOA: ______

☐ E0747: Wearable PEMF Devise

☐ E0221: Infrared Heating Pad System

☐ E0277: Powered Pressure-Reducing Air Mattress

☑ E0675: Pneumatic Compression Device

☑ E0760: Osteogenisis Stimulator - Ultrasound

Osteogenesis stimulators assist in healing fractures when healing has stalled. This procedure is one of complex processes which depend on factors such as the rate at which bone repairs, the level of tissue damage and degree of separation between bone ends, and the blood flow to the area.

Pneumatic Compression Device is used to deliver high pressure and rapid inflation/deflation cycles for treatment of arterial insufficiency.

Powered Pressure-Reducing Air Mattress reduces pressure on wounds, allowing healing and blood circulation to the affected area.

Infrared Heat Unit promotes healing through increase of blood circulation, muscle relaxation, and tissue repair.

Provider Information

Provider Signature: B Baptiste NP Date: 4/28/25

Provider Name (Printed): Barbara Baptiste MSN-FNP-BC NPI: 1356983167

Provider Address: ______

City: ______ MEDICAL PLAZA State: ______ Zip Code: ______

1251 Ralph Avenue
Brooklyn, NY 11236

Phone Number: ______

55. In addition, and as part of the common scheme, based on collusive arrangements between the Secret Owner, the Paper Owner Defendants, Clinic Controllers, and other John Doe Defendants, the DME Providers would each receive virtually identical prescriptions for Fraudulent Equipment from Clinics in the New York metropolitan area, including from the Clinics located at: (i) 1251 Ralph Avenue, Brooklyn, New York (the "Ralph Avenue Clinic"); (ii) 1975 Linden Boulevard, Elmont, New York (the "Linden Boulevard Clinic"); (iii) 146 Empire Boulevard, New York (the "Empire Boulevard Clinic"); (iv) 97-13 101st Avenue, Ozone Park, New York (the "101st Avenue Clinic"); (v) 106-02 Northern Boulevard, Corona, New York (the "Northern Boulevard Clinic"); and (vi) 82-17 Woodhaven Boulevard, Queens, New York (the "Woodhaven Boulevard Clinic").

56. Further, each of the purportedly separately owned DME Providers used the same collection law firm – Sanders, Grossman, Aronova, PLLC – located in Garden City, New York, to submit their billing to GEICO.

**B. Overview of the Common Fraudulent Scheme**

57. The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Providers as vehicles to bill GEICO and other New York automobile insurers over $2.5 million in No-Fault Benefits, which Defendants were never entitled to receive.

58. To mask their fraudulent scheme and maximize the number of No-Fault benefits Defendants could receive, the Secret Owner along with the Paper Owner Defendant used the DME Providers consecutively in an effort to divide the billing they submitted to No-Fault insurance carriers, including GEICO.

59. In keeping with the fact that Defendants divided their billing in order to maximize the amount of No-Fault benefits they could collect, the DME Providers operated in sequential order, with a slight overlap. Specifically:

(i) Between February 11, 2025, and May 19, 2025, Mkind Med Products submitted more than $1,395,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $358,000.00, and there is more than $789,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment from GEICO; and

(ii) Between May 12, 2025, and July 27, 2025, KA Medical Supplies submitted more than $1,142,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $321,000.00 and there are more than $565,000.00 in additional fraudulent claims that have yet to be adjudicated but for which Defendants continue to seek payment from GEICO.

60. The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining illegitimate prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of collusive agreements with the Clinic Controllers and other John Doe Defendants who are associated with the Clinics.

61. Notably, none of Defendants marketed or advertised the DME Providers to the

general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

62. Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

63. Instead, the Defendants entered into collusive agreements with the John Doe Defendants who were associated with both the Clinics and the Referring Providers whereby kickbacks and other financial incentives were paid so that Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the Clinics.

64. The prescriptions obtained by the Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, they were routed directly to the Defendants at the direction of the Clinic Controllers to ensure that the Insureds did not attempt to fill the prescriptions with legitimate DME retailers, who would likely question the legitimacy of the prescriptions, the volume of prescriptions, or the need for the DME in the first instance.

65. The prescriptions obtained by the Defendants for Fraudulent Equipment included prescriptions for Fee Schedule items which the Defendants used to misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by GEICO and other automobile insurers.

66. Each of the Defendants engaged in a virtually identical pattern of submitting bills to GEICO seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent –

sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was actually permissible.

67. By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Providers represented that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME.

68. However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the DME Providers.

69. Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the DME Providers.

70. The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by Defendants.

71. The DME Providers each made virtually identical fraudulent misrepresentations in the HCPCS Codes used and the reimbursement rates charged to GEICO that would have been impossible but for their participation in a common scheme and control by the Secret Owner.

72. After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, the Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable nor medically necessary;

(ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and/or (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

### C. The Fraudulent Scheme – Predetermined Fraudulent Protocols Associated with the Prescriptions

73. The Defendants were able to obtain prescriptions that could be used as a basis to submit bills to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, the Clinic Controllers and other John Doe Defendants, and the Referring Providers.

74. Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat and/or benefit the Insureds.

75. As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrates a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that was not medically necessary to treat the Insureds' post-accident conditions.

76. Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" and "2" were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

77. Concomitantly, almost none of the Insureds identified in Exhibits "1" and "2", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

78. In keeping with the fact that the Insureds identified in Exhibits "1" and "2" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

79. To the extent that the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

80. However, although virtually all of the Insureds were involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar prescription protocols for numerous pieces of Fraudulent Equipment that were not medically necessary.

81. There are a substantial number of variables that can affect if, how, and to what extent an individual is injured in an automobile accident.

82. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

83. The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" and "2" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

84. For example, the predetermined fraudulent protocols at each Clinic (i) included

issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation, and (ii) were not based upon what was medically necessary for each patient. Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

85. In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols at the various Clinics that were the prescription sources for the Defendants.

86. In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

87. Furthermore, in a legitimate setting when treating a patient experiencing soft tissue injuries, a healthcare provider <u>may</u> – but generally does not – prescribe DME, as the majority of simple soft tissue injuries heal on their own with first-line treatments, including rest, ice, compression, elevation, activity modification, and over-the-counter nonsteroidal anti-inflammatory drugs.

88. In the event that first-line treatments fail, then in determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) a functional assessment of the patient's physical limitations; (ii) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (iii) whether the DME is likely to help improve the patient's complained-of condition; and

(iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual diagnostic condition.

89. If a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed, why it was medically necessary, how it would help the patient, and what the individualized treatment goals are for the patient in using the prescribed DME.

90. Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints, improved physical function, and if there were any impediments to the proper use of the DME. Such information is typically addressed so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

91. However, here, and in keeping with the fact that the prescriptions provided to Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols to further an insurance scheme, the Referring Providers routinely issued prescriptions for the Fraudulent Equipment to the Insureds without regard to each Insured's individual condition or symptoms.

92. The Referring Providers issued Fraudulent Prescription Forms from the Clinics that contained identical, boilerplate, non-individualized "explanations" for the prescription of the Fraudulent Equipment without any discussion of any of the patients' actual individual needs and diagnoses, to be described in more detail below.

93. It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits “1” and “2” who were treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

94. It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits “1” and “2” who were treated by different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

95. Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits “1” and “2” that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

96. To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits “1” and “2”.

97. For the reasons set forth above, and below, in each of the claims identified in Exhibits “1” and “2”, the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact,

the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme.

### 1. Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions

98. To gain access to Insureds so that they could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits that could be obtained from GEICO and other New York automobile insurers, the Defendants entered into collusive agreements with the Clinic Controllers and other John Doe Defendants in order to procure and direct prescriptions to the DME Providers that were illegitimate and for medically unnecessary Fraudulent Equipment.

99. Since the inception of the DME Providers, the Defendants engaged in various collusive arrangements with the Clinic Controllers and other John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers for the Fraudulent Equipment that could then be used by the Defendants to support their charges to GEICO and other New York automobile insurers. The improper financial arrangements were key to the fraudulent scheme in that they allowed the Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers. However, the collusive nature of the arrangement goes beyond the simple payment of money or other financial incentives, but includes (i) payment to fictitious businesses associated with the John Doe Defendants, (ii) the ability to secure the prescriptions without ever meeting the Referring Providers, (iii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds, and (iv) providing the Fraudulent Equipment to the Clinic and its staff, without any interaction with the Insureds.

100. The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers. But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the DME Providers to purportedly fill.

101. For example, as a result of these collusive relationships, Mkind Med Products began receiving prescriptions from the Clinics and billing GEICO for Fraudulent Equipment just *thirteen days after* its incorporation.

102. Similarly, KA Medical Supplies began receiving prescriptions from the Clinics and billing GEICO for Fraudulent Equipment just *eighteen days after* its incorporation. In some instances, prescriptions were steered to KA Medical Supplies even though they were dated *before* KA Medical Supplies was incorporated.

103. Upon information and belief, the Referring Providers were compensated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insureds and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions issued in their names to be given to DME suppliers engaged in fraudulent acts, including but not limited to the DME Providers, rather than directly to the Insureds or to a genuine DME retailer, which would likely question their legitimacy.

104. The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions, issued without a specific disclosure to the patient of the financial

relationship between the Referring Provider and the DME Providers, are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d. No such disclosures required by Public Health Law § 238-d were ever made to the Insureds identified in Exhibits "1" and "2." Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Referring Providers were concealed from the Insureds.

105. As a result of these collusive relationships, the Defendants (rather than the Insured or a genuine DME supplier) were given illegitimate prescriptions, which were (i) for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need and were boilerplate Fraudulent Prescription Forms with the Insureds' names changed from prescription to prescription; (ii) contained a photocopied or stamped signature of the Referring Provider; (iii) were undated; and/or (iv) were issued on a date the Referring Provider did not treat or otherwise examine the Insured.

106. For example, as a result of these collusive relationships, the DME Providers both received photocopied prescriptions from the Clinics for Fraudulent Equipment purportedly issued by John McGee, D.O. ("Dr. McGee"), who stated to GEICO that (i) he never issued or authorized the prescriptions that were routed to Mkind Med Products; (ii) he never made a determination that the items prescribed to Insureds were medically necessary; and (iii) prescriptions routed to other DME companies containing the same photocopied or duplicated signature were likewise unauthorized and not based on his determination. Notably, the signatures on prescriptions routed to KA Medical Supplies are virtually identical to those Dr. McGee identified as unauthorized on prescriptions routed to Mkind Med Products.

107. Absent the collusive arrangements between the Defendants and John Doe

Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment, there is no legitimate reason the Defendants would have received these unauthorized prescriptions for Fraudulent Equipment from the Clinics.

108. Further, despite the unauthorized nature of the prescriptions purportedly issued by Dr. McGee, the Defendants used these prescriptions as a basis to bill GEICO for Fraudulent Equipment.

109. Based on the collusive relationships between the Defendants, Clinic Controllers, and other John Doe Defendants, the Defendants received prescriptions from the Clinics that contained unauthorized, photocopied signatures of Dr. McGee and photocopied signatures of other Referring Providers.

110. Once in receipt of these photocopied prescriptions, the Defendants used them as the basis to submit billing to GEICO for Fraudulent Equipment. For example:

<u>Example 1: John McGee, D.O. Photocopied Prescriptions Issued from the Clinic Located at 3432 E Tremont, Bronx, New York</u>

| **<u>Example</u>** | **<u>Sample photocopied signatures</u>** |
| --- | --- |
| Prescription used by **Mkind Med Products** for Insured BJH Undated |  |
| Prescription used by **Mkind Med Products** for Insured MSA Undated |  |
| Prescription used by **KA Medical Supplies** for Insured WG Undated |  |

Example 2: Quais Kamal Sayeed, D.O. Photocopied Prescriptions Issued from the Clinic Located at 82-17 Woodhaven Boulevard, Queens, New York

| Example | Sample photocopied signatures |
|---|---|
| Prescription used by **Mkind Med Products** for Insured RG Dated 4/10/2025 |   |
| Prescription used by **Mkind Med Products** for Insured RP Dated 4/17/2025 |   |
| Prescription used by **KA Medical Supplies** for Insured JC Dated 5/01/2025 |   |
| Prescription used by **KA Medical Supplies** for Insured MA Dated 5/15/2025 |   |

Example 3: Roger Ruvinov, N.P. Photocopied Prescriptions Issued from the Clinic Located at 2748 Ocean Avenue, Brooklyn, New York

| Example | Sample photocopied signatures |
|---|---|
| Prescription used by **KA Medical Supplies** for Insured JY Dated 2/05/2025 |   |
| Prescription used by **Mkind Med Products** for Insured PB Dated 3/12/2025 |   |

| | |
|---|---|
| Prescription used by **Mkind Med Products** for Insured AS Dated 3/12/2025 |  Provider Signature: |

Example 4: Opal Taylor, N.P. Photocopied Prescriptions Issued from the Clinic Located at 60 Belmont Avenue, Brooklyn, New York

| **Example** | **Sample photocopied signatures** |
|---|---|
| Prescription used by **KA Medical Supplies** for Insured TG Dated 5/19/2025 |  Provider Information Provider Signature: Provider Name (Printed): Opal Taylor 337566 |
| Prescription used by **KA Medical Supplies** for Insured BK Dated 5/21/2025 |  Provider Information Provider Signature: Provider Name (Printed): Opal Taylor 337566 |
| Prescription used by **KA Medical Supplies** for Insured JL Dated 6/02/2025 |  Provider Information Provider Signature: Provider Name (Printed): Opal Taylor 337566 |

Example 5: Kumar Singh, P.A. Photocopied Prescriptions Issued from the Clinic Located at 945 Coney Island Avenue, Brooklyn, New York

| **Example** | **Sample photocopied signatures** |
|---|---|
| Prescription used by **Mkind Med Products** for Insured CM Undated |  Kumar Singh |

| | |
|---|---|
| Prescription used by **Mkind Med Products** for Insured RG Undated |  |
| Prescription used by **Mkind Med Products** for Insured TT Undated |  |

111. These are only representative examples of the types of photocopied or stamped prescriptions received by the Defendants for Fraudulent Equipment and used as the basis to submit billing to GEICO.

112. As a result of these collusive arrangements, and in further support of the fact that the prescriptions for Fraudulent Equipment purportedly issued by Referring Providers and routed to the Defendants were medically unnecessary and obtained as part of a predetermined fraudulent protocol, there were at times significant delays between the date on which the prescription was issued and the date on which it was delivered to the Insured. For example:

(i) Insured JV was allegedly involved in a motor vehicle accident on November 22, 2024. Thereafter, JV sought treatment with Kathleen Philbin, N.P. ("NP Philbin") at the 101st Avenue Clinic. On February 12, 2025, NP Philbin purportedly issued two separate prescriptions to JV for an "Ultrasound" and a PCD, which were delivered to JV by Mkind Med Products **54 days** later, on April 7, 2025.

(ii) Insured DNM was allegedly involved in a motor vehicle accident on January 8, 2025. Thereafter, DNM sought treatment with Sophia Staley, N.P. ("NP Staley") at the Empire Boulevard Clinic. On January 15, 2025, NP Staley purportedly issued a prescription to DNM for an "Osteogenesis Stimulator – Ultrasound" and a PCD, which were delivered to DNM by Mkind Med Products **65 days** later, on March 20, 2025.

(iii) Insured MI was allegedly involved in a motor vehicle accident on March 30, 2025. Thereafter, MI sought treatment with Pia Bowen, N.P. ("NP Bowen") at the Empire Boulevard Clinic. On April 7, 2025, NP Bowen

purportedly issued a prescription to MI for an "Osteogenesis Stimulator – Ultrasound" and a PCD, which were delivered to MI by KA Medical Supplies **73 days** later, on June 18, 2025.

(iv) Insured CPL was allegedly involved in a motor vehicle accident on April 4, 2025. Thereafter, CPL sought treatment with Keshia Laporte, N.P. ("NP K. Laporte") at the Linden Boulevard Clinic. On April 17, 2025, NP K. Laporte purportedly issued a prescription to CPL for an "Ultrasound" and a PCD, which were delivered to CPL by KA Medical Supplies **82 days** later, on July 7, 2025.

(v) Insured CS was allegedly involved in a motor vehicle accident on April 9, 2025. Thereafter, CS sought treatment with NP K. Laporte at the Linden Boulevard Clinic. On April 17, 2025, NP K. Laporte purportedly issued a prescription to CS for an "Ultrasound" and a PCD, which were delivered to CS by KA Medical Supplies **90 days** later, on July 15, 2025.

113. These are only representative examples.

114. In contrast to a bona fide DME retailer, the Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions to support their charges to GEICO and other automobile insurers.

115. Defendants were able to enter collusive arrangements with the John Doe Defendants in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for No-Fault insurance fraud.

116. These Clinics included but were not limited to: (i) the Ralph Avenue Clinic; (ii) the Linden Boulevard Clinic; (iii) the Empire Boulevard Clinic; (iv) the 101st Avenue Clinic; (v) the Northern Boulevard Clinic; and (vi) the Woodhaven Boulevard Clinic.

117. Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

118. In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice," without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

119. For example, GEICO has received billing for purported healthcare services rendered from (i) the Linden Boulevard Clinic from a "revolving door" of over 230 different healthcare providers; (ii) the Empire Boulevard Clinic from a "revolving door" of over 190 different healthcare providers; and (iii) the Woodhaven Boulevard Clinic from a "revolving door" of over 115 different healthcare providers.

120. Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits for the generation of revenue for their own benefit and the benefit of those with whom they are associated without regard to actual patient care.

**2. The Predetermined Fraudulent Prescription Protocols at the Clinics**

121. Through their collusive arrangements with the John Doe Defendants, Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Clinics pursuant to predetermined fraudulent protocols, which serve to further illustrate Defendants' fraudulent scheme.

122. The Insureds identified in Exhibits "1" and "2" that were prescribed Fraudulent Equipment from the Clinics were typically involved in minor "fender-bender" motor vehicle

accidents and then purportedly treated by a variety of healthcare providers at the Clinics.

123. However, during the course of their treatment at the Clinics, the Insureds were regularly issued prescriptions for Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was issued pursuant to predetermined fraudulent protocols.

124. For example, many of the prescriptions identified in Exhibits "1" and "2" were not actually issued by the Referring Provider listed on the prescription. Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions as these prescriptions contained a photocopied signature of the Referring Provider.

125. Further, at times, the prescriptions purportedly issued by the Referring Providers erroneously misidentified the nurse practitioners as medical doctors. Specifically, some of the prescriptions that were purportedly issued by NP Staley, NP Bowen, NP K. Laporte, and Jessica Laporte, N.P. ("NP J. Laporte") erroneously misidentified them as medical doctors "Dr. Sophia Staley NP," "Dr. Pia Bowen," "Dr. Keshia Laporte," or "Dr. Jessica Laporte."

126. In legitimate medical practice, a nurse practitioner would not misstate their credentials and identify themselves as a medical doctor. However, this occurred repeatedly in the prescriptions purportedly issued by the Referring Providers, demonstrating that the Referring Providers were not exercising independent medical judgment when issuing these prescriptions, to the extent the Referring Providers actually issued the prescriptions at all, and that the prescriptions for Fraudulent Equipment were instead the byproduct of collusive arrangements and predetermined fraudulent protocols.

127. Virtually all of the claims identified in Exhibits "1" and "2" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were

purportedly issued by the Referring Providers who practiced at various No-Fault Clinics across the New York metropolitan area.

### a. Medically Unnecessary Prescriptions for PCDs

128. As part of the fraudulent scheme, the Referring Providers issued prescriptions to Insureds for PCDs that were medically unnecessary and pursuant to the predetermined prescription protocols established at the Clinics.

129. These medically unnecessary prescriptions were then routed directly to the DME Providers and used as a basis to submit billing to GEICO.

130. Virtually all of the charges for PCDs that the Defendants submitted, or caused to be submitted, were pursuant to preprinted Fraudulent Prescription Forms that called for a "E0675: Pneumatic Compression Device."

131. To create the false impression that the PCDs prescribed by the Referring Providers were medically necessary, the prescriptions contained the following language:

> Pneumatic Compression Device is used to deliver high pressure and rapid inflation/deflation cycles for treatment of arterial insufficiency.

132. The template prescriptions refer to a PCD's legitimate use in treating arterial insufficiency, yet none, if any contemporaneous medical records indicated that the Insureds identified in Exhibits "1" and "2" were diagnosed with arterial insufficiency.

133. A PCD is a type of pump that inflates a removable cuff and provides sequential pressure to the limbs.

134. Per CMS coding guidelines, the PCDs for which the Referring Providers prescribed, and the Defendants sought reimbursement from GEICO under HCPCS Code E0675, are high-pressure rapid-cycling pneumatic compression devices used to aid in the treatment of

arterial insufficiency. Although arterial insufficiency may have more than one cause, the records at issue do not reflect peripheral arterial disease, traumatic arterial injury, abnormal arterial testing, ischemic symptoms, vascular specialist evaluation, or any other diagnosed arterial condition supporting use of a PCD that qualifies under HCPCS Code E0675.

135. In response to the prescriptions purportedly issued by the Referring Providers for PCDs, the Defendants billed GEICO under HCPCS Code E0675 with a charge of $2,826.70 per Insured who purportedly received the device.

136. By billing GEICO for PCDs using HCPCS E0675, Defendants represented to GEICO that the specific PCD that qualifies under HCPCS Code E0675 was medically appropriate for Insureds, despite none, if any contemporaneous medical records indicating arterial insufficiency, abnormal arterial testing, ischemic symptoms, vascular specialist evaluation, or any other diagnosed arterial condition.

137. In keeping with the fact that the PCDs prescribed by the Referring Providers were not medically necessary, the Referring Providers would issue prescriptions for PCDs within days of the accident – and in some instances, on the *very day* of the accident itself – despite the Insureds not being diagnosed with arterial insufficiency.

138. For example:

(i) On January 17, 2025, Insured ZS was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On January 20, 2025, just **3** days after the accident, Barbara Baptiste, N.P. ("NP Baptiste") purportedly issued a prescription to ZS for a PCD which was routed to **Mkind Med Products**, even though ZS did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(ii) On January 17, 2025, Insured ESM was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On January 20, 2025, just **3** days after the accident, NP Baptiste purportedly issued a prescription to ESM for a PCD which was routed to

**Mkind Med Products**, even though ESM did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(iii) On January 21, 2025, Insured VD was allegedly involved in a motor vehicle accident and received treatment at the Ralph Avenue Clinic that same day. On January 21, 2025, the **day of** the accident, NP Staley purportedly issued a prescription to VD for a PCD which was routed to **Mkind Med Products**, even though VD did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(iv) On February 11, 2025, Insured JSP was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On February 13, 2025, just **2** days after the accident, NP Bowen purportedly issued a prescription to JSP for a PCD which was routed to **Mkind Med Products**, even though JSP did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(v) On February 11, 2025, Insured JTD was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On February 12, 2025, just **1** day after the accident, NP Bowen purportedly issued a prescription to JTD for a PCD which was routed to **Mkind Med Products**, even though JTD did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(vi) On April 1, 2025, Insured RR was allegedly involved in a motor vehicle accident and thereafter received treatment at the Linden Boulevard Clinic. On April 3, 2025, just **2** days after the accident, Keisha Burrell, N.P. ("NP Burrell") purportedly issued a prescription to RR for a PCD which was routed to **Mkind Med Products**, even though RR did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(vii) On April 24, 2025, Insured DL was allegedly involved in a motor vehicle accident and received treatment at the Ralph Avenue Clinic that same day. On April 24, 2025, the **day of** the accident, NP Bowen purportedly issued a prescription to DL for a PCD which was routed to **KA Medical Supplies**, even though DL did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(viii) On April 28, 2025, Insured RMB was allegedly involved in a motor vehicle accident and received treatment at the Ralph Avenue Clinic that same day. On April 28, 2025, the **day of** the accident, NP Baptiste purportedly issued a prescription to RMB for a PCD which was routed to **KA Medical Supplies**, even though RMB did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(ix) On May 7, 2025, Insured NS was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On May 8, 2025, just **1** day after the accident, NP Bowen purportedly issued a prescription to NS for a PCD which was routed to **KA Medical Supplies**, even though NS did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

(x) On May 19, 2025, an Insured named JCM was purportedly involved in a motor vehicle accident and thereafter started treatment at the Woodhaven Boulevard Clinic. On May 22, 2025, just **3** days after the accident, Quais Kamal Sayeed, D.O. ("Dr. Sayeed") purportedly issued a prescription to JCM for a PCD which was routed to **KA Medical Supplies**, even though JCM did not have peripheral artery disease and was not diagnosed with arterial insufficiency.

139. These are only representative examples.

140. In response to these medically unnecessary prescriptions for PCDs, the Defendants submitted over $864,000.00 in fraudulent billing to GEICO under HCPCS Code E0675.

141. For these reasons, in each of the claims identified in Exhibits "1" and "2", the Defendants falsely represented that PCDs were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions for the PCDs were not medically necessary. Rather they were prescribed pursuant to predetermined fraudulent protocols and collusive arrangements among Defendants, Clinic Controllers, and other John Doe Defendants.

**b. Medically Unnecessary Prescriptions for Powered Air Mattresses**

142. As part of the fraudulent scheme, the Referring Providers issued prescriptions to Insureds for Powered Air Mattresses that were medically unnecessary and pursuant to the predetermined prescription protocols established at the Clinics.

143. These medically unnecessary prescriptions were then routed directly to the DME Providers and used as a basis to submit billing to GEICO.

144. Virtually all of the charges for Powered Air Mattresses that the Defendants submitted, or caused to be submitted, were pursuant to preprinted Fraudulent Prescription Forms

that called for a "E0277: Powered Pressure-Reducing Air Mattress."

145. Powered Air Mattresses are specialized support surfaces that use powered air technology to redistribute pressure and reduce friction and shear in patients with qualifying pressure ulcers or wound care needs.

146. To create the false impression that the Powered Air Mattresses prescribed by the Referring Providers were medically necessary, the prescriptions contained the following language:

> Powered Pressure-Reducing Air Mattress reduces pressure on wounds, allowing healing and blood circulation to the affected area.

147. The template prescriptions refer to a Powered Air Mattress's legitimate use in reducing pressure on wounds, yet none of the Insureds identified in Exhibits "1" and "2" had a documented wound that met the qualifications for the legitimate application of a Powered Air Mattress as described above.

148. To the extent there was a contemporaneous medical report issued by the Referring Providers, these records are devoid of any mention or diagnosis regarding "pressure ulcers" or that the Insured was bed-bound and at risk of developing pressure ulcers, which would necessitate a Powered Air Mattress.

149. In response to the prescriptions purportedly issued by the Referring Providers for Powered Air Mattresses, the Defendants billed GEICO under HCPCS Code E0277 with a charge of $3,961.75 per Insured who purportedly received the device.

150. Various commercial insurers have issued policy bulletins that make clear the use of a Powered Air Mattress is only necessary under limited circumstances, while CMS's website refers to guidance for Powered Air Mattresses billed under HCPCS Code E0277 that limits coverage to a patient suffering from pressure ulcers.

151. Specifically, CMS's published guidance states as follows:

> [Powered Air Mattresses] are covered if the beneficiary meets at least one of the following three Criteria:
>
> 1. The beneficiary has multiple stage 2 pressure ulcers located on the trunk or pelvis (refer to the ICD-10 code list section in the LCD-related Policy Article for applicable diagnoses) which have failed to improve over the past month, during which time the beneficiary has been on a comprehensive ulcer treatment program including each of the following:
>
>     a. Use of an appropriate group 1 support surface, and
>     b. Regular assessment by a nurse, practitioner, or other licensed healthcare practitioner, and
>     c. Appropriate turning and positioning, and
>     d. Appropriate wound care, and
>     e. Appropriate management of moisture/incontinence, and
>     f. Nutritional assessment and intervention consistent with the overall plan of care
>
> 2. The beneficiary has large or multiple stage 3 or 4 pressure ulcer(s) on the trunk or pelvis (refer to the ICD-10 code list section in the LCD-related Policy Article for applicable diagnoses),
>
> 3. The beneficiary had a myocutaneous flap or skin graft for a pressure ulcer on the trunk or pelvis within the past 60 days (refer to the ICD-10 code list section in the LCD-related Policy Article for applicable diagnoses) and has been on a group 2 or 3 support surface immediately prior to discharge from a hospital or nursing facility within the past 30 days.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdId=33642&ver=26.

152. As with the other Fraudulent Equipment billed by the Defendants, the Powered Air Mattresses were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

153. Notwithstanding the limited accepted uses for Powered Air Mattresses, the Referring Providers repeatedly prescribed Powered Air Mattresses to Insureds who suffered no pressure ulcers, nor were at risk of developing pressure ulcers, but rather issued these prescriptions based upon the predetermined protocols established at the Clinics to maximize profits and without

regard to genuine patient care.

154. In keeping with the fact that the Powered Air Mattresses prescribed by the Referring Providers were not medically necessary, the Referring Providers would issue prescriptions for Powered Air Mattresses within days of the accident – and in some instances, on the *very day* of the accident itself – despite the Insureds not being bedbound, at risk of developing pressure ulcers, or having existing qualifying pressure ulcers or wound-care needs.

155. For example:

(i) On April 1, 2025, Insured SM was allegedly involved in a motor vehicle accident and thereafter received treatment at the Northern Boulevard Clinic. On April 4, 2025, just **3** days after the accident, NP Staley purportedly issued a prescription to SM for a Powered Air Mattress which was routed to **KA Medical Supplies**, even though SM was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(ii) On April 2, 2025, Insured LI was allegedly involved in a motor vehicle accident and thereafter received treatment at the Woodhaven Boulevard Clinic. On April 3, 2025, just **1** day after the accident, Dr. Sayeed purportedly issued a prescription to LI for a Powered Air Mattress which was routed to **Mkind Med Products**, even though LI was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(iii) On April 2, 2025, Insured MK was allegedly involved in a motor vehicle accident and thereafter received treatment at the Woodhaven Boulevard Clinic. On April 3, 2025, just **1** day after the accident, Dr. Sayeed purportedly issued a prescription to MK for a Powered Air Mattress which was routed to **Mkind Med Products**, even though MK was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(iv) On April 2, 2025, Insured DO was allegedly involved in a motor vehicle accident and thereafter received treatment at the Woodhaven Boulevard Clinic. On April 3, 2025, just **1** day after the accident, Dr. Sayeed purportedly issued a prescription to DO for a Powered Air Mattress which was routed to **Mkind Med Products**, even though DO was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(v) On April 29, 2025, Insured RR was allegedly involved in a motor vehicle accident and thereafter received treatment at the Northern Boulevard Clinic. On April 30, 2025, just **1** day after the accident, NP Staley purportedly issued a prescription to RR for a Powered Air Mattress which was routed to **KA Medical Supplies**, even though RR was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(vi) On May 13, 2025, Insured MR was allegedly involved in a motor vehicle accident and thereafter received treatment at the 101st Avenue Clinic. On May 15, 2025, just **2** days after the accident, NP Staley purportedly issued a prescription to MR for a Powered Air Mattress which was routed to **KA Medical Supplies**, even though MR was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(vii) On May 30, 2025, Insured AA was allegedly involved in a motor vehicle accident and thereafter received treatment at the Northern Boulevard Clinic. On June 2, 2025, just **3** days after the accident, NP Staley purportedly issued a prescription to AA for a Powered Air Mattress which was routed to **KA Medical Supplies**, even though AA was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(viii) On May 30, 2025, Insured CM was allegedly involved in a motor vehicle accident and thereafter received treatment at the Northern Boulevard Clinic. On June 2, 2025, just **3** days after the accident, NP Staley purportedly issued a prescription to CM for a Powered Air Mattress which was routed to **KA Medical Supplies**, even though CM was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(ix) On June 16, 2025, Insured JAM was allegedly involved in a motor vehicle accident and thereafter received treatment at the Woodhaven Boulevard Clinic. On June 19, 2025, just **3** days after the accident, Dr. Sayeed purportedly issued a prescription to JAM for a Powered Air Mattress which was routed to **KA Medical Supplies**, even though JAM was not bedbound, not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

(x) On June 26, 2025, Insured LE was allegedly involved in a motor vehicle accident and received treatment at the Woodhaven Boulevard Clinic that same day. On June 26, 2025, the **day of** the accident, Dr. Sayeed purportedly issued a prescription to LE for a Powered Air Mattress, which was routed to **KA Medical Supplies**, even though LE was not bedbound,

not in danger of developing pressure ulcers, and did not have qualifying pressure ulcers or other wound-care needs.

156. These are only representative examples.

157. In response to these medically unnecessary prescriptions for Powered Air Mattresses, the Defendants submitted over $673,000.00 in fraudulent billing to GEICO under HCPCS Code E0277.

158. For these reasons, in each of the claims identified in Exhibits "1" and "2", the Defendants falsely represented that Powered Air Mattresses were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions for the Powered Air Mattresses were not medically necessary. Rather they were prescribed pursuant to predetermined fraudulent protocols and collusive arrangements among Defendants, Clinic Controllers, and other John Doe Defendants.

**c. Medically Unnecessary Prescriptions for Osteogenesis Stimulators**

159. As part of the fraudulent scheme, the Referring Providers issued prescriptions to Insureds for Osteogenesis Stimulators that were medically unnecessary and pursuant to the predetermined prescription protocols established at the Clinics.

160. These medically unnecessary prescriptions were then routed directly to the DME Providers and used as a basis to submit billing to GEICO.

161. Virtually all of the charges for Osteogenesis Stimulators that the Defendants submitted, or caused to be submitted, were pursuant to preprinted Fraudulent Prescription Forms that called for a "E0760: Osteogenesis Stimulator - Ultrasound" or "E0760: Ultrasound."

162. Osteogenesis Stimulators are devices used to encourage bone growth and accelerate fracture healing in specific, documented circumstances.

163. To create the false impression that the Osteogenesis Stimulators prescribed by the

Referring Providers were medically necessary, the prescriptions contained the following language:

> Osteogenesis stimulators assist in healing fractures when healing has stalled. This procedure is one of complex processes which depend on factors such as the rate at which bone repairs, the level of tissue damage and degree of separation between bone ends, and the blood flow to the area.

164. The template prescriptions refer to an Osteogenesis Stimulator's legitimate use in healing bone fractures, yet none of the Insureds identified in Exhibits "1" and "2" had a documented bone fracture that met the qualifications for the legitimate application of an Osteogenesis Stimulator as described above.

165. In keeping with the fact that the prescriptions for Osteogenesis Stimulators were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Insureds' contemporaneous medical records did not document a fracture at the proposed site, serial radiographs demonstrating a lack of clinical significant healing, a treating provider's interpretation of fracture non-union, or another individualized fracture-healing assessment supporting the use of an Osteogenesis Stimulator qualifying under HCPCS Code E0760.

166. In response to the prescriptions purportedly issued by the Referring Providers for Osteogenesis Stimulators, the Defendants billed GEICO under HCPCS Code E0760 with a charge of $2,700.00 per Insured who purportedly received the device.

167. Various commercial insurers have issued policy bulletins that make clear the use of an osteogenesis stimulator is only necessary to heal bone fractures under limited circumstances, while the Centers for Medicare & Medicaid Services ("CMS") has published guidance stating that ultrasonic Osteogenesis Stimulators billed under HCPCS Code E0760 are covered only in limited circumstances.

168. Specifically, CMS's published guidance states as follows:

> An ultrasonic Osteogenesis Stimulator is covered only if all of the following criteria are met:

> 1. Nonunion of a fracture documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days. Each radiograph set must include multiple views of the fracture site accompanied by a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs; and
> 2. The fracture is not of the skull or vertebrae; and
> 3. The fracture is not tumor related.
>
> Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the Osteogenesis Stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.
>
> An ultrasonic Osteogenesis Stimulator will be denied as not medically necessary if none of the criteria above are met.
>
> Use of an ultrasonic Osteogenesis Stimulator for the treatment of a fresh fracture or delayed union will be denied as not medically necessary…
>
> An ultrasonic Osteogenesis Stimulator will be denied as not medically necessary if it is used with other noninvasive Osteogenesis Stimulators.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

169. As with the other Fraudulent Equipment billed by the Defendants, the Osteogenesis Stimulators were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat the Insureds.

170. Notwithstanding the limited, accepted uses for Osteogenesis Stimulators, the Defendants repeatedly billed for expensive Osteogenesis Stimulators under HCPCS Code E0760, which were purportedly dispensed to numerous Insureds who suffered no bone fractures – all solely to maximize profits without regard to genuine patient care.

171. In keeping with the fact that the Osteogenesis Stimulators prescribed by the

Referring Providers were not medically necessary, Insureds were frequently prescribed these devices within days of their accident.

172. For example:

(i) On January 2, 2025, Insured JC was allegedly involved in a motor vehicle accident and thereafter received treatment at the Northern Boulevard Clinic. On January 7, 2025, just **5** days after the accident, Graham Hadley, M.D. ("Dr. Hadley") purportedly issued a prescription to JC for an "Ultrasound" which was routed to **Mkind Med Products**, even though JC did not have a documented bone fracture.

(ii) On March 25, 2025, Insured AA was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On March 27, 2025, just **2** days after the accident, NP Bowen purportedly issued a prescription to AA for an "Osteogenesis Stimulator – Ultrasound" which was routed to **Mkind Med Products**, even though AA did not have a documented bone fracture.

(iii) On March 25, 2025, Insured JW was allegedly involved in a motor vehicle accident and thereafter received treatment at the Ralph Avenue Clinic. On March 27, 2025, just **2** days after the accident, NP Bowen purportedly issued a prescription to JW for an "Osteogenesis Stimulator – Ultrasound" which was routed to **Mkind Med Products**, even though JW did not have a documented bone fracture.

(iv) On March 27, 2025, Insured RD was allegedly involved in a motor vehicle accident and thereafter received treatment at the Linden Boulevard Clinic. On March 28, 2025, just **1** day after the accident, NP Bowen purportedly issued a prescription to RD for an "Ultrasound" which was routed to **Mkind Med Products**, even though RD did not have a documented bone fracture.

(v) On April 6, 2025, Insured TTB was allegedly involved in a motor vehicle accident and thereafter received treatment at the Linden Boulevard Clinic. On April 10, 2025, just **4** days after the accident, NP K. Laporte purportedly issued a prescription to TTB for an "Ultrasound" which was routed to **Mkind Med Products**, even though TTB did not have a documented bone fracture.

(vi) On April 13, 2025, Insured PC was allegedly involved in a motor vehicle accident and thereafter received treatment at the Linden Boulevard Clinic. On April 17, 2025, just **4** days after the accident, NP K. Laporte purportedly issued a prescription to PC for an "Ultrasound" which was routed to **KA Medical Supplies**, even though PC did not have a documented bone fracture.

(vii) On April 16, 2025, Insured ACL was allegedly involved in a motor vehicle accident and thereafter received treatment at the Linden Boulevard Clinic. On April 17, 2025, just **1** day after the accident, NP K. Laporte purportedly issued a prescription to ACL for an "Ultrasound" which was routed to **KA Medical Supplies**, even though ACL did not have a documented bone fracture.

(viii) On May 14, 2025, an Insured named DS was purportedly involved in a motor vehicle accident and thereafter started treatment at the Empire Boulevard Clinic. On May 19, 2025, just **5** days after the accident, NP Bowen purportedly issued a prescription to DS for an "Osteogenesis Stimulator - Ultrasound" which was routed to **KA Medical Supplies**, even though DS did not have a documented bone fracture.

(ix) On May 17, 2025, Insured IM was allegedly involved in a motor vehicle accident and thereafter received treatment at the Linden Boulevard Clinic. On May 22, 2025, just **5** days after the accident, NP K. Laporte purportedly issued a prescription to IM for an "Ultrasound" which was routed to **KA Medical Supplies**, even though IM did not have a documented bone fracture.

(x) On May 19, 2025, an Insured named DL was purportedly involved in a motor vehicle accident and thereafter started treatment at the Empire Boulevard Clinic. On May 21, 2025, just **2** days after the accident, NP Bowen purportedly issued a prescription to DL for an "Osteogenesis Stimulator - Ultrasound" which was routed to **KA Medical Supplies**, even though DL did not have a documented bone fracture.

173. These are only representative examples.

174. In response to these medically unnecessary prescriptions for Osteogenesis Stimulators, the Defendants submitted over $955,000.00 in fraudulent billing to GEICO under HCPCS Code E0760.

175. For these reasons, in each of the claims identified in Exhibits "1" and "2", the Defendants falsely represented that Osteogenesis Stimulators were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions for the Osteogenesis Stimulators were not medically necessary. Rather they were prescribed pursuant to predetermined fraudulent protocols and collusive arrangements among Defendants, Clinic Controllers, and other

John Doe Defendants.

### D. The Defendants' Common Fraudulent Misrepresentations Regarding the DME Purportedly Dispensed

176. In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants, and dispensing the Fraudulent Equipment without a licensed healthcare provider determining the medical necessity of specific DME, the Defendants each submitted bills to GEICO that misrepresented the DME provided to the Insureds – to the extent that any DME actually was provided.

177. As part of Defendants' common scheme and control by the Secret Owner, the bills submitted to GEICO and other New York automobile insurers by Defendants made virtually identical misrepresentations regarding the HCPCS Codes used for the Fee Schedule items purportedly provided.

178. Additionally, at times, the Defendants would submit multiple bills to GEICO for Fraudulent Equipment that was provided to Insureds on the same date in an attempt to conceal the scheme to fraudulently bill GEICO for Fraudulent Equipment purportedly provided to GEICO's Insureds by artificially lowering the amount of any one bill submitted to GEICO.

179. Moreover, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the type of Fraudulent Equipment matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

180. The Fee Schedule specifically defines the requirements for each HCPCS Code for DME billing purposes.

181. Additionally, Palmetto provides specific characteristics and requirements that DME must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee

Schedule items and Non-Fee Schedule items.

182. By submitting bills to GEICO containing specific HCPCS Codes, Defendants each represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

183. However, in most of the claims for Fraudulent Equipment identified in Exhibits "1" and "2", when Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

184. To the extent that Defendants provided any of the Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO routinely severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

185. For example, when the Defendants billed GEICO for PCDs under HCPCS Code E0675 seeking $2,826.70, the use of this HCPCS Code severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

186. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0675, the item provided by the Defendants – to the extent the Defendants dispensed any item to the Insureds – did not comport with the requirements necessary to bill under HCPCS Code E0675 and was instead a cheap, poorly made item not reimbursable at $2,826.70 per unit.

187. Additionally, when the Defendants billed GEICO for Powered Air Mattresses under HCPCS Code E0277 seeking $3,961.75, the use of this HCPCS Code severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

188. Despite billing GEICO – and other New York automobile insurers – using HCPCS

Code E0277, the item provided by the Defendants – to the extent the Defendants provided any item to the Insureds – did not comport with the requirements necessary to bill under HCPCS Code E0277 and was instead a cheap, poorly made item not reimbursable at $3,961.75 per unit.

189. Further, when the Defendants billed GEICO for Osteogenesis Stimulators under HCPCS Code E0760 seeking $2,700.00, the use of the HCPCS Code in the bills submitted to GEICO severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

190. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0760, the items provided by the Defendants – to the extent the Defendants provided any items to the Insureds – did not comport with the requirements necessary to bill under HCPCS Code E0760 and were instead cheap, poorly made items not reimbursable at $2,700.00 per unit.

191. In many of the claims for Fee Schedule items identified within Exhibits "1" and "2", to the extent that any Fraudulent Equipment was actually provided, the Defendants fraudulently misrepresented the Fraudulent Equipment provided to the Insureds in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

## III. <u>The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO</u>

192. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names of the DME Providers, seeking payment for the Fraudulent Equipment.

193. The NF-3 or HCFA-1500 forms that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive

No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment based on prescriptions secured through collusive arrangements with the John Doe Defendants, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers.

(iii) The NF-3 forms, HCFA-1500 forms, and prescriptions, uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because to the extent that the Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iv) The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms.

## IV. <u>The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

194. The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME to Insureds, and their actual submission of charges to GEICO.

195. To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

196. Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to a common insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

197. Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and secured through collusive arrangements, including prescriptions were unauthorized and that contained photocopied or otherwise duplicated signatures of the Referring Providers.

198. In addition, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the provision of the Fraudulent Equipment dispensed was pursuant to an insurance fraud scheme in which decisions were made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

199. Finally, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to Insureds.

200. The Defendants knowingly operated their fraudulent scheme in a sequential fashion

designed to frustrate GEICO's efforts to identify fraud, shifting the billing between the two providers. The billing and supporting documentation submitted by Defendants, when viewed in isolation, did not in itself reveal its fraudulent nature.

201. GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

202. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piecemeal fashion against GEICO and other insurers. The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of No-Fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

203. GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $680,000.00 based upon the fraudulent charges

representing payments made by GEICO to Defendants.

204. Based upon Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the DME Providers**
**(Mkind Med Products and KA Medical Supplies)**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

205. GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

206. There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $1,355,000.00 in pending fraudulent billing that has been submitted to GEICO in the names of the DME Providers.

207. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were not based upon medical necessity but were instead submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e., the John Doe Defendants), without regard for genuine patient care, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers.

208. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills for the Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and prescriptions secured though

collusive arrangements, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers.

209. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the DME Providers purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions for medically necessary items issued by healthcare providers who are licensed to issue such prescriptions.

210. The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent that the DME Providers actually provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

211. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Mkind Med Products and KA Medical Supplies.

**<u>SECOND CAUSE OF ACTION</u>**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

212. GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

213. Mkind Med Products and KA Medical Supplies together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

214. The members of the DME Provider Enterprise are and have been associated through

time, joined in purpose and organized in a manner amenable to hierarchical and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Mkind Med Products and KA Medical Supplies are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

215. The DME Provider Enterprise operated under separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

216. The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

217. The Paper Owner Defendants and John Doe Defendant "1" have each been

employed by and/or associated with the DME Provider Enterprise.

218. The Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; and (iv) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of

this Complaint are described in the chart annexed hereto as Exhibits “1” and “2.”

219. The DME Provider Enterprise’s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant “1” operated the DME Providers, inasmuch as the DME Providers never operated as legitimate DME providers, never were entitled to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

220. The DME Provider Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Provider Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

221. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $680,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Provider Enterprise.

222. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys’ fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

223. GEICO repeats and realleges each and every allegation contained in this Complaint

as if fully set forth at length herein.

224. The DME Provider Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

225. The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Provider Enterprise.

226. The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME; and (iv) to the extent the DME Providers actually provided any Fraudulent Equipment, the DME Providers

each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" and "2."

227. The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

228. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $680,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Provider Enterprise.

229. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
**Against Mkind Med Products, Kozak, and John Doe Defendant "1"**
**(Common Law Fraud)**

230. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

231. Mkind Med Products, Kozak, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

232. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for

reasonable and medically necessary DME when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, to the extent the prescriptions were even authorized at all; (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME; and (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

233. Mkind Med Products, Kozak, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Mkind Med Products that were not

compensable under New York No-Fault insurance laws.

234. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $358,000.00 pursuant to the fraudulent bills submitted by Mkind Med Products, Kozak, and John Doe Defendant "1."

235. Mkind Med Products, Kozak, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

236. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
**Against Mkind Med Products, Kozak, and John Doe Defendant "1"**
**(Unjust Enrichment)**

237. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

238. As set forth above, Mkind Med Products, Kozak, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

239. When GEICO paid the bills and charges submitted by or on behalf of Mkind Med Products for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

240. Mkind Med Products, Kozak, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Mkind Med Products, Kozak, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper,

unlawful, and unjust billing scheme.

241. The retention of GEICO's payments by Mkind Med Products, Kozak, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

242. By reason of the above, Mkind Med Products, Kozak, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $358,000.00.

**SIXTH CAUSE OF ACTION**
**Against KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1"**
**(Common Law Fraud)**

243. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

244. KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Equipment.

245. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, to the extent the prescriptions were even authorized at all; (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment

was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were not authorized by the Referring Provider and/or contained photocopied or otherwise duplicated signatures of the Referring Providers; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME; and (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

246. KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through KA Medical Supplies that were not compensable under New York No-Fault insurance laws.

247. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $321,000.00 pursuant to the fraudulent bills submitted by KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1".

248. KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1"''s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles

GEICO to recover punitive damages.

249. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1"**
**(Unjust Enrichment)**

250. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

251. As set forth above, KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

252. When GEICO paid the bills and charges submitted by or on behalf of KA Medical Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

253. KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

254. The retention of GEICO's payments by KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" violates fundamental principles of justice, equity and good conscience.

255. By reason of the above, KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $321,000.00.

**EIGHTH CAUSE OF ACTION**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

256. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

257. The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the DME Providers, Paper Owner Defendants, and the Secret Owner.

258. The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions, including unauthorized prescriptions, for Fraudulent Equipment issued pursuant to a predetermined protocol to maximize profits without regard to patient care and routing those prescriptions directly to the Defendants and bypassing the Insureds.

259. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the DME Providers, Paper Owner Defendants, and the Secret Owner to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

260. The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the DME Providers, Paper Owner Defendants, and the Secret Owner for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

261. The conduct of the John Doe Defendants caused GEICO to pay more than

$680,000.00 pursuant to the fraudulent bills submitted through the DME Providers.

262. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

263. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## JURY DEMAND

264. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor:

A. On the First Cause of Action against Mkind Med Products and KA Medical Supplies for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Mkind Med Products and KA Medical Supplies do not have the right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of action against the Paper Owner Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $680,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial

but more than $680,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Mkind Med Products, Kozak, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $358,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against Mkind Med Products, Kozak, and John Doe Defendant "1" for more than $358,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F. On the Sixth Cause of Action against KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $321,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G. On the Seventh Cause of Action against KA Medical Supplies, Abdukadyrova, and John Doe Defendant "1" for more than $321,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

H. On the Eighth Cause of Action against the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $680,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: August 18, 2026
Uniondale, New York

RIVKIN RADLER LLP

By: /s/ Barry I. Levy

Barry I. Levy, Esq.
Steven Henesy, Esq.
Michael Vanunu, Esq.
Rawson Jahan, Esq.
Danielle M. Drasser, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*